CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
APR 1 2 2006
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>THOMAS E. COGHILL, JR.,<br><br>*Defendant.* | CRIMINAL CASE NO. 3:04-CR-00089<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This matter comes before the Court on Defendant Thomas Coghill's Motion for Release Pending Appeal, filed March 23, 2006. For the reasons stated below, Defendant's motion will be denied in an order to follow.

## I. BACKGROUND

On August 17, 2005, Defendant pled guilty to one count of wire fraud in violation of 18 U.S.C. §1343 (Count One) and one count of bank fraud in violation of 18 U.S.C. §1344 (Count Four) of a six-count superceding indictment (the "indictment"). The indictment states that Defendant conducted a home building business in and around the Charlottesville, Virginia area. Anchor Capital Corporation of Potomac, Maryland ("Anchor" or "the Gordons"[1]); Citizens & Farmers Bank of Richmond, Virginia ("C&F Bank"); and Donald Melcher of Charlottesville, Virginia ("Melcher") provided financing to entities controlled by Defendant for this business.

---

[1] Michael and Rena Gordon are co-owners and co-principals of Anchor. (PSR ¶13; D. Loss Memo p.10 n.9).

The indictment charges that Defendant devised schemes to defraud these financiers.[2] From 1992 until 1999, Defendant made false oral representations to Melcher that certain construction projects were completed or substantially completed to induce Melcher to advance additional loan funds. (Indict. ¶4). Between November 1998 until about January 2000, he forged and falsified, or caused to be forged and falsified, "in excess of thirty" certificates of occupancy, home inspection certificates, and surveys for houses, which he faxed to Anchor in order to obtain additional loans under a financing agreement with Anchor, while knowing that the homes represented as collateral were not substantially completed or under construction at all.[3] (*Id.* ¶¶6-7). Finally, in March and April 2000, in order to obtain loans from C&F Bank, he faxed two documents falsely representing that the construction of houses to serve as collateral was substantially complete when in fact he knew the parcels in question were vacant lots.[4] (*Id.* ¶8).

On March 15, 2006, having considered the parties' filings, and hearing the evidence and argument presented by counsel and the victims' impact statements, and after considering the factors set forth in 18 U.S.C. § 3553(a), the Court imposed a sentence of 30 months and ordered restitution in the amount of $2,839,520 to the Gordons and $170,000 to Melcher,[5] adopting the

---

[2] In his plea agreement, Defendant "willingly" stipulated that "there is a sufficient factual basis to support each and every material factual allegation contained within the charging document." (*Plea Ag.* at 7, Aug. 17, 2005).

[3] This conduct serves as the basis of Counts One, Two, and Three.

[4] This conduct serves as the basis of Counts Four, Five, and Six.

[5] Prior to sentencing, Defendant paid back C&F Bank in full. (PSR at 15).

2

recommendations contained in the presentence report (PSR) over Defendant's objections.[6] The 30-month sentence is in the middle of the advisory guideline range of 27 to 33 months yielded by an offense level of 18[7] and criminal history category I. The same day as sentencing, the Court signed an order permitting Defendant to self-report once the facility at which he will be incarcerated has been designated, and requiring him to post a $250,000 bond to reasonably ensure his appearance.

## II. LAW GOVERNING RELEASE PENDING APPEAL

The applicable standard for release pending appeal is set forth at 18 U.S.C. §3143(b)(1), which provides that Defendant may be released if the judicial officer finds:

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; **and**
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
> (i) reversal,
> (ii) an order for a new trial,
> (iii) a sentence that does not include a term of imprisonment, or
> (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

(emphasis added). By ordering Defendant to be released pending execution of his sentence, the

---

[6] Although the Court adopted the PSR with changes, (*see* 3/21/06 Statement of Reasons), none of these changes affected the advisory guideline range or restitution calculation.

[7] The parties agrees that the 2000 Guidelines apply in this case. (*Plea Ag.* at 2, Aug. 17, 2005). The offense level of 18 was calculated as follows:
(i) The base offense level for a violation of 18 U.S.C. §1344 is 6 (U.S.S.G. Manual §2F1.1 (2000));
(ii) Thirteen (13) levels were added pursuant to U.S.S.G. Manual §2F1.1(b)(1)(L) (2000), based on loss caused by Defendant's conduct of over $2,500,000 but below $5,000,000;
(iii) Two (2) levels were added pursuant to U.S.S.G. §2F1.1(b)(2) (2000), because the scheme involved more than one victim and more than minimal planning; and
(iv) Three (3) levels were subtracted for acceptance of responsibility.

3

Court implicitly found by clear and convincing evidence that he was not likely to flee or pose a danger to the safety of any other person or the community under the conditions of release imposed. (Order Setting Conditions of Release); 18 U.S.C. § 3143(a). Section 3143(b)(1)(A) is thus satisfied.

As for the other prerequisite of release pending appeal, a "substantial" question is "'a 'close' question or one that very well could be decided the other way.'" *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (quoting *States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).

## III. DISCUSSION—IS THERE A SUBSTANTIAL QUESTION ON APPEAL?

Defendant cites the following as the substantial questions of law or fact raised at sentencing that warrant his release: (1) how to calculate loss on property secured by real estate; (2) the relationship of payment of fees, interest, and penalties to principal in calculating loss; (3) "whether altered records may be relied on by the Court in arriving at loss calculations"; and (4) "whether Anchor can fairly claim losses when they were aware the property was undeveloped." (Mot. for Release Pending Appeal ¶15). Questions 1 and 2 are issues of law; questions 3 and 4 are thinly disguised issues of fact.

### 1. Methodology of calculating loss on property secured by real estate

The legal question of how to calculate loss on property secured by real estate is not substantial. Application Note 8 to §2F1.1 of the 2000 Guidelines states that if a defendant fraudulently misrepresents the value of his assets to obtain a loan, "the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan."

4

U.S.S.G. Manual §2F1.1 cmt. n.8(b) (2000). In the loss calculations adopted by the Court, the $4,113,600 in principal Anchor loaned Defendant in reliance on his fraudulent statements was reduced by his repayments of principal as well as net proceeds from foreclosure of property securing these loans.[8] (S. Tr. 9, 137-138; Gov't Position Statement Exhs. 5, 6; PSR ¶13). Defendant raises no serious question that this approach is inconsistent with the Guidelines.

2. Loss valuation methodology

As noted, the Court adopted the valuation of loss contained in the PSR over Defendant's objections, having considered the written record as well as the evidence and testimony presented at the sentencing hearing.

In finding that Melcher suffered approximately $170,000 in actual losses, the probation officer relied on the findings of the FBI and the U.S. Attorney's Office.[9] (PSR ¶8 & Addend. p.18). In deciding to adopt the $170,000 figure, the Court also considered Melcher's testimony and that of Defendant's accounting expert. (S. Tr. 37-41, 65-69). The probation officer's loss calculation for the Gordons of $2,839,520 is based on information contained in their victim impact statement and in the discovery file provided by the U.S. Attorney's Office, which shows that they advanced Defendant $4,113,600 in loans in reliance on his false representations concerning collateral, of which $1,274,080 in principal was paid back or otherwise recovered by

---

[8] In *United States v. Lutz*, 154 F.3d 581, 590 (6th Cir. 1998), the Sixth Circuit approved the district court's determination that the amount "recovered" from resale of pledged collateral is net of expenses that the defrauded lender incurred "in taking over the properties, paying the claims of the lenders, maintaining and repairing the properties, and reselling them."

[9] The probation officer ultimately recommended a "conservative" loss finding of $170,000, because Melcher's records did not distinguish between loan principal and accrued contractual interest and penalties. (PSR Addend p.18; S. Tr. 38-39).

5

foreclosing on collateral, leaving them with the $2,829,520 actual loss. (S. Tr. 35, D's Exh. 20; PSR ¶9 & Addend. p.18). Mrs. Gordon also testified at sentencing that Anchor suffered approximately $3 million in losses, a sum that excludes accrued but unpaid interest, fees, and penalties, and credits Defendant for amounts recovered from the liquidation of collateral. (S. Tr. 9-10, 17). The Court adopted the $2,829,520 figure contained in the PSR. (3/21/06 Statement of Reasons).

Defendant argues that the court erred in adopting these loss figures because "interest, fees, costs, attorney fees, and other non-principal items, must be excluded from any loss claims against Mr. Coghill." (D. Loss Memo. p. 9). Defendant contends that Melcher and the Gordons (the "victims") lost nothing, because any payments he made to them—whether applied to accrued fees, penalties, interest, or principal—must be subtracted from total principal. In support of this position, Defendant submitted the reports and presented the testimony of an expert who conducted a "flow of funds" analysis and concluded that (1) Melcher received repayments of $609,291 more than the $1,413,000 in principal loaned to Defendant over the course of their business relationship, and (2) the Gordons received repayments of $128,401 more than the $5,998,165.59 total loan principal advanced to Defendant. (*Id.*, p. 10, 23, Exhs. 1, 12; S. Tr. 58, 73-77, 85).

Section 2F1.1 of the 2000 Guidelines governs fraud offenses. Section 2F1.1 sets a base offense level of six. Section 2F1.1(b)(1) provides a table that increases the offense level as the amount of the loss attributable to the fraud increases. Loss need not be determined with precision, and the court may make a reasonable estimate of the loss given the available information. U.S.S.G. Manual §2F1.1 cmt. n.9 (2000). In fraudulent loan application cases, if a

defendant fraudulently misrepresents the value of his assets to obtain a loan, "the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to secure the loan." *Id.*, cmt. n.8(b).

Valuation of "loss" under §2F1.1 is discussed in the commentary to §2B1.1. *Id.*, cmt. n.8. "Loss" means the value of the property taken, damaged, or destroyed. U.S.S.G. Manual §2B1.1 cmt. n.2 (2000). Application Note 2 states that loss "does not include interest that could have been earned had the funds not been stolen." *Id.*

The ambiguity of this latter statement caused some circuit courts to draw a distinction between contractual interest—interest a defendant had explicitly agreed to pay the victim that had not been paid as of the time of the loss calculation—which they held could properly be added in calculating the loss total, and "opportunity cost" interest—the speculative interest a victim might have earned in the market had he not been deprived of the use of his funds—which had to be excluded under Application Note 2. "Other circuits rejected the distinction between contractual interest and opportunity cost interest and concluded that all interest owed on loans was excluded from the Guidelines' definition of loss." *United States v. Morgan*, 376 F.3d 1002, 1010 (9th Cir. 2004) (discussing circuit split and citing cases).

The 2004 Guidelines include an application note that resolved this circuit split in favor of the latter view.[10] Note 3(D)(i) states that loss shall not include "[i]nterest of any kind, finance

---

[10] The intent to resolve the circuit split is reflected in the Commission's remarks:

> The amendment reflects a decision by the Commission that interest and similar costs shall be excluded from loss . . . . Thus, the rule resolves the circuit split regarding whether 'bargained for' interest may be included in loss. [Comparing cases.] This rule

7

charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." U.S.S.G. Manual §2B1.1 cmt. n.3(D)(i) (2004); *Morgan*, 376 F.3d at 1011-12. Defendant may rely on Note 3(D)(i), despite the use of the 2000 Guidelines in this case, because it is a clarification, rather than an amendment, of earlier application notes concerning the inclusion of interest in loss calculations. *Morgan*, 376 F.3d at 1009-1013 (9th Cir. 2004) (noting that an amendment to the Sentencing Guidelines will be given retroactive effect if it plainly serves to clarify pre-existing law rather than to alter it, and finding that Note 3(D)(i) merely clarified rather than substantively changed preexisting law).

However, Note 3(D)(i) does not support the "flow of funds" approach to loss calculation Defendant advocates.[11] This approach ignores the law and logic supporting a distinction between (i) interest, fees, and penalties *still owing* as of the time of the loss calculation, as opposed to that which has already been paid, and (ii) loan principal obtained legally, versus that which was procured by fraud.

In *United States v. Aptt*,[12] defendants convicted on various counts of conspiracy, fraud, and money laundering for their role in executing a Ponzi scheme argued that the district court

---

> is consistent with the general purpose of the loss determination to serve as a rough measurement of the seriousness of the offense and culpability of the offender and avoids unnecessary litigation regarding the amount of interest to be included.

U.S.S.G. Manual app. C Vol. 2 at 182-83 (2003) (Amendment 617).

[11] As noted above, this approach would have the Court subtract from the total principal each victim lent Defendant all payments made to that victim—regardless of whether the payments were applied to principal or against the balance of interest, fees, and penalties owed under the financing agreements.

[12] 354 F.3d 1269 (10th Cir.2004).

8

erred in calculating loss by failing to deduct $2.1 million in interest payments they had made to early investors in the scheme from the total principal received from investors. As in this case, the *Appt* defendants proposed calculating loss by deducting all previously repaid principal and interest from the total principal they had received. *Id* at 1278 n.1. Rejecting this approach to loss calculation, the Tenth Circuit noted:

> Besides being legally unsound, this method would have the absurd consequence that a pure Ponzi scheme (one in which all money received from later investors is paid out to earlier investors as principal or interest) would produce zero aggregate loss to investors, because losses to later investors would be offset by the high profits reaped by early investors.

*Id.* Although this case does not involve a Ponzi scheme, adoption of Defendant's "flow of funds" approach would also have an absurd consequence: it would grossly understate the harmfulness and seriousness of his scheme to defraud, in which instead of admitting that he was losing money on each house he built, he lulled his financiers by making periodic repayments—which he well knew they would apply first to accrued interest, fees, and penalties—thereby encouraging them to make further advances of capital and postponing the day of reckoning. (S. Tr. 232).

The "flow of funds" approach also ignores the legal requirement that Defendant's fraudulent conduct be casually connected to any loss, by indiscriminately lumping together and then netting out total loan principal and total repayments, without regard to which transactions were tainted by fraud. Further, it is not supported by comment 3(D)(i) to §2B1.1 of the 2004 Guidelines, on which Defendant stakes his position, because that comment was intended to settle a circuit split as to the propriety of including *unpaid* contractual interest, fees, and penalties in loss calculations. *See supra* n.10. Finally, Defendant has cited no authority (and none appears to

9

support) his approach to loss calculation. *See, e.g.,* United *States v. Davoudi,* 172 F.3d 1130, 1136 (9th Cir. 1999) ("Interest paid by the defendant can not . . . reduce the amount of principal lost by the victim; it can only reduce the amount of interest outstanding on the loan."); *Aptt,* 354 F.3d at 1278; *United States v. Kunzman,* 54 F.3d 1522, 1532 (10th Cir. 1995).

For all of these reasons, the loss valuation issue is not a substantial question. However, even if it was, Defendant must also show a substantial issue with respect to the alternative ground cited by the Court in imposing the 30-month sentence: that Defendant's proposed loss calculation of $0, which would yield a base offense level of 5, would understate the seriousness of his conduct and warrant an upward departure. (S. Tr. 272-73) (citing comment 8(b) to 2F1.1, which provides, "In some cases, the loss determined above may significantly understate or overstate the seriousness of the defendant's conduct . . . . In such a case . . . an upward or downward departure may be warranted").

Prior to the Guidelines being rendered advisory, the Fourth Circuit stated that it reviews a district court's factual findings regarding a departure for clear error and the reasonableness of the extent of an upward departure for abuse of discretion. *United States v. Davis,* 380 F.3d 183, 188 (4th Cir. 2004). The "the ultimate decision to depart" is reviewed *de novo. Id.* at 187. The Fourth Circuit appears to continue adhere to these standards of review today. *United States v. Majercik,* 145 Fed.Appx. 802, 803 n.2 (4th Cir. 2005) (unpublished disposition); *United States v. Hawkins,* 149 Fed.Appx. 184, 186 (4th Cir. 2005) (unpublished disposition).

As the Guidelines' loss valuation comment explicitly endorses upward departures in cases in which the seriousness of criminal conduct is understated, the Court's alternative finding that departure would be warranted in this case is likely to be upheld on review. Further, the

Court's factual finding that the seriousness of Defendant's conduct would be understated by a loss finding of $0 is amply supported by Defendant's admitted conduct of transmitting dozens of fraudulent documents to his creditors, and is not likely to be disturbed under review for clear error.[13] Finally, the extent of upward departure will be subject to deferential "abuse of discretion" review. In light of Defendant's flagrant abuse of trust of three lenders over a significant time period, the Court doubts that a departure of 13 levels from a 0-6 month advisory range to a 27-33 month range would be viewed by a reviewing court as an abuse of discretion.

In sum, Defendant has not raised a substantial question as to either the correct method of valuing loss in this case, or, in the alternative, the appropriateness of a 13-level upward departure in the event of a finding of no loss.

### 3. Reliability of records relied on by the Court

The next "substantial" question Defendant cites in support of his motion is "whether altered records may be relied on by the Court in arriving at loss calculations." Though framed at as a legal question, the thrust of Defendant's position is that Court erred in finding that certain records supplied by victims were sufficiently reliable to provide a basis for loss valuation.

Defendant contends that Rena Gordon supplied Quicken accounting records during discovery in July 2005 that she stripped of relevant data concerning payments made by Coghill when later submitting the records to substantiate the loss calculation included in her victim

---

[13] The Guidelines comment cites the following as an example in which an upward departure may be warranted: "For example, where the defendant substantially understated his debts to obtain a loan, which he nevertheless repaid, the loss determined above (zero loss) will tend not to reflect adequately the risk of loss created by the defendant's conduct." U.S.S.G. Manual §2F1.1 cmt. n.8(b) (2000). The situation in this case is analogous, as defendant substantially overstated the value of collateral in order to obtain loans, creating risk to his creditors.

11

impact statement of November 2005. (S. Tr. 24-26, 79, 81-85, 88-89). However, the Court heard explanations by Mrs. Gordon and Defendant's expert of the alleged discrepancy in the records that satisfied it that those contained in the victim impact statement are reliable: the records produced in July 2005 consisted of raw data of all transactions between Anchor and Coghill's entities, which Mrs. Gordon later reviewed to correct miscodings and other clear errors, while those submitted in November 2005 provided only *relevant* data, i.e. data necessary to calculate outstanding principal net of recovered collateral—resulting in the exclusion of data concerning payments by Coghill applied to fees, penalties, and interest. (*Id.* 24-25, 84-85). Thus, unlike Defendant, the Court would characterize the November 2005 accounting records as "processed"—not "altered." The Court's factual determination that these records are reliable will be reviewed on appeal using a clearly erroneous standard. 18 U.S.C. §3742(e); *United States v. Daughtrey*, 874 F.2d 213, 217-18 (4th Cir. 1989). In light of Defendant's failure to maintain or submit accounting records of his own,[14] and the fact that loss need not be determined with precision, but may be based on a reasonable estimate given the available information,[15] the Court sees no substantial question of fact as to the reliability of the victims' records.

4. Anchor's alleged awareness of fraud

Finally, Defendant plans to appeal the Court's adoption of the PSR's finding that the Gordons had no knowledge *at the time* fresh loan funds were advanced that properties securing

---

[14] (S. Tr. 231).

[15] U.S.S.G. Manual §2F1.1 cmt. n.9 (2000).

12

these loans were empty lots or otherwise fraudulently financed.[16] (PSR Addend p.18; 3/21/05 Statement of Reasons ¶1B). The Court considered the testimony and written submission of Defendant's expert, Thomas Carr, who evaluated various real estate documents contained in Anchor's files and concluded that Mrs. Gordon, a principal of Anchor and a law school graduate,[17] "knew" that parcels securing the loans were unimproved. Carr's conclusion is based on his finding that these documents contained indicia that would have alerted "[a]ny experienced transactional real estate attorney" to Defendant's misrepresentations. (D. Loss Memo Exh. 2).[18]

The Court also heard Rena Gordon testify that she first learned in March 2000 that the collateral securing Anchor's loans were not improved as represented by Defendant[19]; heard Mr. Gordon's victim impact statement in which he corroborated his wife's testimony[20]; considered the findings contained in the PSR[21]; and, by assuming that Defendant would not have gone to the

---

[16] A contrary finding would sever the causal connection between Anchor's loss of principal and the fraudulent certificates of occupancy, home inspection certificates, and surveys for houses that Defendant faxed to Anchor. (D. Loss Memo Exh. 2 p. 2, 6; Indict ¶7; PSR p.4 ¶9; Plea Ag. p.7).

[17] Mrs. Gordon's practice included real estate until 1976.(S. Tr. 19). She processed substitutions of collateral for existing loans, while engaging outside counsel to assist with documentation and closing when Anchor initiated a new loan to Cherry Hill Investment Company, an entity controlled by Defendant. (*Id.* at 20; D. Loss Memo Exh. 2 p. 5).

[18] Mr. Carr similarly testified at the sentencing hearing that "from the documents available to Anchor in the ordinary course of these loan closings, it should have been obvious" to Anchor that its loan proceeds "were being used to finance the purchase of raw lots . . . not to carry an inventory of completed or substantially completed homes." (S. Tr. 106).

[19] (S. Tr. 10-12, 16).

[20] (S. Tr. 235 *et seq.*).

[21] (PSR p.4 ¶9).

13

Case 3:04-cr-00089-NKM-BWC Document 153 Filed 04/12/06 Page 13 of 15 Pageid#: 821

trouble of faxing Anchor over 30 falsified documents without any purpose, drew the logical inference that Mrs. Gordon needed to be persuaded that the collateral actually met the substantial completion requirement of the loan documents prior to disbursing fresh loans to Defendant.[22]

Weighing this conflicting evidence, the Court found that the Gordons had no actual knowledge that Anchor's loans were secured only by empty or not substantially improved lots at the time fresh loans were disbursed. This finding will only be reversed on appeal if clearly erroneous. A finding is clearly erroneous if "'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Scrimgeour v. Internal Revenue*, 149 F.3d 318, 324 (4th Cir.1998) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Id.* (quoting *Zfass v. C.I.R.*, 118 F.3d 184, 188 (4th Cir.1997)). In light of the above-cited evidence supporting the Court's finding, it concludes that there is no substantial question as to the existence of two permissible views of the Gordons' knowledge.

## IV. CONCLUSION

Given the absence of a substantial question of law or fact to be raised on appeal likely to result in a reversal or a reduced term of imprisonment, Defendant's motion for release pending appeal will be denied in an order to follow.

The Clerk of the Court is directed to send certified copies of this MEMORANDUM OPINION to all Counsel of Record.

---

[22] (Indict. ¶7; Plea Ag. p.7).

14

ENTERED: _____
U.S. District Judge

_April 12, 2006_
Date

15